IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FELIX RAMIREZ,

                     Plaintiff,

  v.

WISCONSIN MASONS WELFARE FUND and
ITS TRUSTEES, DAVID BOHL JASON MATTILA,
MATT QUASIUS, DEAN BASTEN, JERRY SHEA,       OPINION and ORDER
LARRY RASCH, JOHN TOPP, JEFF STAVER,
BARRY SCHOLZ, DAVID HAHN, JIM VICK,            21-cv-101-jdp
WYNN JONES, MIKE HYATT,
WILLIAM BONLENDER, JEFF LECKWEE,
ANDY REED, PATRICK McCABE and
TOBIN BOYLE,

                     Defendants.

---

       The Wisconsin Masons Welfare Fund is a trust set up to manage a benefit plan for the members of several construction trade unions. Employers with collective bargaining agreements with the unions fund the trust with contributions based on the hours worked by each union member. One of the participating unions, the Operative Plasters and Cement Masons International Association, Local 599, has decided to leave the Masons Welfare Fund and join a different larger fund. Pursuant to the trust agreement, the members of a withdrawing union are entitled to an equitable share of the property and funds held by the Masons Welfare Fund.

       Plaintiff Felix Ramirez is a member of Local 599 and a trustee of Masons Welfare Fund. Ramirez contends that the withdrawing members of Local 599 did not get their equitable share of the property and funds of the Masons Welfare Fund, and he asserts claims under the Employee Retirement Income Security Act (ERISA).

Both sides move for summary judgment. Ramirez contends that Local 599 was entitled to not only the funds in its members' individual accounts, but also to a proportionate share of the general assets of the Masons Welfare Fund. Applying the deferential standard of review applicable to ERISA cases of this type, the court concludes that the Masons Welfare Fund had adequate reasons for providing to the members of Local 599 only the amounts in their individual accounts. It was reasonable for the trustees of the Masons Welfare Fund to conclude that the transfer struck a fair balance between the interests of the withdrawing employees and the financial health of the Masons Welfare Fund. The court will grant summary judgment to defendants and close the case.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

### A. Background on the Welfare Fund

Defendant Wisconsin Masons Welfare Fund is trust established to operate a health and welfare plan for the benefit of the members of its participating construction unions. The plan had around 1,400 employee participants as of 2019.

The Masons Welfare Fund is administered by a 20-member board of trustees, with ten trustees who represent employers and ten who represent employees. Plaintiff Felix Ramirez is the business agent of Local 599, an employee trustee of the Masons Welfare Fund, and he was a participant in the benefit plan until his union withdrew from the Masons Welfare Fund.

The Masons Welfare Fund is funded by employer contributions paid on behalf of its employees for each hour of work the employee performs. At the time relevant to this lawsuit, employers contributed $9.75 for each hour worked. Dkt. 49-5, at 9. Employer contributions

are credited first to the "Member Dollar Bank" account associated with a particular employee. *See id.* At the end of each month, the Masons Welfare Fund deducts the cost of the employee's benefit plan from the employee's Member Dollar Bank. Dkt. 49-3, at 15. To participate in the plan, an employee must be credited with employer contributions that meet or exceed the monthly cost of his or her plan, and employees are required to retain in their Member Dollar Bank reserves to cover three months of plan coverage. Hours worked that would result in payments in excess of the eligibility requirements are credited to the Member Dollar Bank at a rate of $4 per hour worked, and the remainder of the hourly contribution is credited to the Masons Welfare Fund's reserve assets. *Id.*

If the balance of a participant's Member Dollar Bank exceeds the reserve requirement, the employee may use the excess funds to maintain eligibility in the plan if their employee contributions are short for a given month. *Id.* at 38. Participants may also use the excess funds to pay for other eligible health care expenses including deductibles, copayments, and medical expenses not covered by the plan. *Id.* Participants may elect to hold the excess funds in their Member Dollar Bank on a credit card called a WEX card. The parties use the term "Member Dollar Bank" in different ways, and it is sometimes unclear whether they mean to refer to participants' eligibility reserves, accrued excess funds, one or the other, both, or neither. In this opinion, the court will use Member Dollar Bank to refer to all funds in accounts held for the benefit of a specific participant, including that participant's eligibility reserves, as well as excess funds that can be used for qualifying health care expenses.

The Masons Welfare Fund holds other assets that are accounted for separately from the Member Dollar Banks. The Masons Welfare Fund uses these assets to cover its administrative

expenses and to maintain a reserve against claims for benefits that would not be paid from the Member Dollar Banks.

The Masons Welfare Fund trust agreement gives the trustees "full power to construe the provisions of [the] Agreement" and "the terms used herein." Dkt. 1-1, § 5.18. The trust agreement provides a process by which a participating union may withdraw. *Id*., § 9.12. The pertinent portion of § 9.12 of the agreement instructs the trustees how to divide the trust's assets when a union withdraws:

> Upon such withdrawal having become effective, the then property and the funds of said Trust shall by the Trustees herein named, be equitably apportioned for the benefit of (1) the Employees represented by the withdrawing Union and of (2) the remaining Employees participating in the benefits of the Trust.

*Id*. The trust agreement does not specifically define either "the then property and the funds of [the] Trust" or "equitably apportioned."

**B. Events giving rise to this lawsuit**

Plaintiff Ramirez is the business agent and a member of the Operative Plasters and Cement Masons International Association, Local 599. Local 599 was a member of the Masons Welfare Fund. In August 2020, Local 599 informed the trustees that it intended to withdraw from the Masons Welfare Fund and join a different benefit plan, the Bricklayers and Allied Craftworkers International Health Fund. Another participating union, BAC Local 5, filed its own withdrawal notice about a week later. The board of trustees took up the requests to withdraw at a meeting in October. At the meeting, the employer trustees argued that an equitable apportionment of the property and funds of the trust would be to transfer the Member Dollar Bank balances of the departing participants. After some discussion, the board

4

tabled the withdrawal requests to allow its accountant to determine if the Masons Welfare Fund could offer similar benefits to those offered by the International Health Fund.

The board met again in December. At that meeting, trustee Mike Hyatt moved on behalf of BAC Local 5 to withdraw from the Masons Welfare Fund. Hyatt proposed that an equitable apportionment of fund assets would be to transfer participants' Member Dollar Banks, as well as employer contributions made on behalf of Local 5 employees for the last three months. Ramirez proposed his own motion to withdraw on behalf on behalf of Local 599. Ramirez proposed that an equitable apportionment under § 9.12 of the trust agreement would provide Local 599 with participants' Member Dollar Bank balances, as well as "a pro-rata percentage of all other [Masons Welfare Fund] assets . . . based on the percentage of hours contributed on behalf of" participants represented by Local 599. Dkt. 60-14, at 3.

Both motions failed on a deadlocked vote. At the next meeting later that month, Hyatt modified his motion on behalf of Local 5 to abandon the request for the last three months of employer contributions. The motion accepted a transfer of the participants' Member Dollar Banks, including their three-month eligibility reserves and WEX card balances. The motion passed unanimously, or nearly so—Ramirez states that he abstained but that the chair did not ask trustees to voice their abstentions. Ramirez refused to modify his motion on behalf of Local 599. Ramirez's motion for Local 599 again failed on a deadlocked vote.

Ramirez filed this lawsuit in February 2021. The board revisited Ramirez's motion to withdraw at a meeting in March. Another trustee moved to accept Local 599's withdrawal from the Fund effective January 1, 2021, and to set Local 599's share of the equitable apportionment under § 9.12 equal to its members' Member Dollar Bank balances. The motion passed over Ramirez's opposition. Local 599's Member Dollar Bank balances were transferred to the

5

International Health Fund in June 2021. The International Health Fund used the first $1,000 from each new participant to offset the cost of providing immediate coverage. Any remaining balance was placed into a new healthcare reimbursement account for that participant. Dkt. 54, ¶ 44.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Ramirez asserts two claims under ERISA against the Masons Welfare Fund and its trustees: (1) a claim in his capacity as a plan participant to enforce his right to an equitable allocation of the Masons Welfare Fund's assets; (2) a claim that the trustee defendants breached their fiduciary duty to the trust. Both claims are based on the trustees' alleged failure to comply with § 9.12 of the trust agreement.

Both sides move for summary judgment. The usual standards apply. Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court evaluates each motion separately, construing the facts and drawing all reasonable inferences from those facts in favor of the nonmovant. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

The Masons Welfare Fund trustees have broad discretion to interpret the trust agreement because the agreement gives them the "full power" to construe its provisions and terms. Dkt. 1-1, § 5.18. Accordingly, the court must review the decisions of the defendants under a deferential arbitrary and capricious standard. *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700. Under the arbitrary and capricious standard, the

court must uphold the administrator's decision "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (internal quotation marks omitted). The decision will be overturned only if it is "downright unreasonable." *Butler v. Encyclopedia Brittanica, Inc.*, 41 F.3d 285, 288 (7th Cir. 1994).

In most ERISA cases, the court's review is limited to the administrative record. But in this case, the court allowed Ramirez to conduct discovery because evidence bearing on whether the Masons Welfare Fund's decisions were arbitrary and capricious might not have been part of the record. Dkt. 38. It appears that discovery led to relevant evidence, because both sides cite it. But the parties agree that the underlying facts are not genuinely disputed.

The ultimate issue here is whether it was "equitable" to distribute only the Member Dollar Bank balances to the members of Local 599, without including any share of the Masons Welfare Fund's general assets. But to put a finer point on it, in light of the deferential arbitrary and capricious standard of review, the question is whether it was downright unreasonable for the Masons Welfare Fund to conclude that that was an equitable distribution to the withdrawing members. The court concludes that it was not unreasonable, and thus the court will grant summary judgment to defendants. Because the court is deciding the case on the merits of Ramirez's theory of liability, the court need not address defendants' alternative argument that Ramirez has not stated a claim under 20 U.S.C. § 1132.

**A. The "property and the funds" of the Masons Welfare Fund**

Ramirez suggests that the Member Dollar Bank balance are "liabilities" and not truly assets of the Masons Welfare Fund. Thus, Ramirez's argument seems to go, only the general assets are "property and funds" of the trust subject to equitable apportionment, and the Masons Welfare Fund was required to apportion at least some of those general assets to the members of a withdrawing union. The court is not persuaded.

First, the Masons Welfare Fund is a trust, and it held all of its assets, both the Member Dollar Bank balances and the general assets, for the benefit of the participants. *See, e.g.,* Dkt. 49-3 at 50 (summary plan description). The trustees had the authority to use even the money in participants' Member Dollar Banks to cover its expenses if the Masons Welfare Fund was at risk of going insolvent. Dkt. 53-4 (Boyle Dep. at 19:16–20:10). So, even though the Masons Welfare Fund balance sheet listed the Member Dollar Bank balances as a liability, the trustees actually held title to the funds in the Member Dollar Banks.

Second, it would be inconsistent for Ramirez to take this position for Local 599, when he voted as a trustee to support the equitable apportionment of only the Member Dollar Bank balances for the Heavy and Highway group participants, which is discussed further below. And Ramirez didn't oppose that same treatment for the withdrawing Local 5. (The parties dispute whether Ramirez voted for that treatment or whether he abstained.) Ramirez's change of position does not rise to the level of estoppel, but it seriously undermines his implicit argument that it would be unreasonable to consider the Member Dollar Bank balances to be the "funds or property" of the trust.

Third, Ramirez concedes that the Member Dollar Banks are assets of the Masons Welfare Fund. *See* Dkt. 60-5 (Ramirez Dep. at 21:18–25 ("[WEX card balances and three-

8

month eligibility reserves] are considered plan assets.")); Dkt. 62, at 13 (Ramirez's opposition brief).

The court concludes that the Masons Welfare Fund reasonably interpreted and applied the trust term "property and the funds" of the trust. "Property and the funds" of the trust includes both the balances in the Member Dollar Banks and the general assets of the fund.

B. **Equitable apportionment**

Section 9.12 provides that the property and funds of the trust will be "equitably apportioned for the benefit of" the employees represented by the withdrawing union and the remaining plan participants. Dkt. 1-1, § 9.12. It was reasonable for the board to conclude that transferring the withdrawing employees' Member Dollar Banks struck an equitable balance between the departing employees and the employees who remained in the Masons Welfare Fund.

At the first meeting on the withdrawal requests in October 2020, the employer trustees gave five reasons why it would be equitable to transfer only the Member Dollar Bank balances and not a portion of the general assets: (1) it was the same arrangement that the trustees had made with a different group of plan participants that withdrew earlier that year; (2) the Masons Welfare Fund was not meeting its goal to have 10 months' worth of expenses in reserve; (3) the Masons Welfare Fund would continue to provide benefits for Local 599's retirees, who were not transferring to the International Health Fund; (4) recent increases in net income were related to COVID-19 and would disappear after demand for services returned to normal; and (5) transferring any additional funds would only minimally benefit withdrawing participants because the International Health Fund already had ample reserves. *See* Dkt. 60-13, at 4–6.

The court concludes that these reasons are valid, and thus the trustees' decision was not "irrational" or "downright unreasonable." *See Sisto*, 429 F.3d at 700. The trustees considered "the relevant factors that encompass the important aspects of the problem." *Edwards,* 639 F.3d at 360. The proposed division protects the financial health of the Masons Welfare Fund while ensuring that the departing participants did not lose their eligibility reserves or the excess contributions they had accrued. It was reasonable for the board to conclude that providing a larger share to Local 599 would harm the remaining participants while providing little benefit to the withdrawing employees who would be protected by financial stability of the International Health Fund.

Ramirez resists this conclusion, contending that the decision was arbitrary and capricious for four main reasons: (1) the Masons Welfare Fund *did* have over 10 months of reserves when the trustees voted on the apportionment; (2) the trustees did not consider the benefit to the withdrawing participants; (3) the allocation that other groups of withdrawing participants received is not relevant; and (4) that the costs associated with the remaining Local 599 retirees would not be significant. The court is not persuaded that any of these purported issues suggest that the trustees' decision was arbitrary or capricious.

**1. Ten-month reserve target**

Ramirez's best argument is that the Masons Welfare Fund was, in fact, meeting its goal to have enough assets to cover 10 months of expenses. Ramirez adduced a quarterly financial report prepared by the Masons Welfare Fund's actuary stating that the Masons Welfare Fund had more than 12 months of reserves as of November 2020 and more than 14 months of reserves as of February 2021. *See* Dkt. 49-7, at 21. The report was produced in April 2021, after the trustees voted on Local 599's withdrawal, and Ramirez concedes that the trustees did

10

not have the report before the vote. Dkt. 68, at 4. But Ramirez says that the report shows that the financial health of the fund "was nowhere near as dire as Defendants claim." *Id.*

Even if the trustees could have learned this information before they voted on the allocation to Local 599, their failure to do so does not render their decision arbitrary and capricious. The trustees did not pull their numbers out of thin air; it is undisputed that the trustees reviewed the Masons Welfare Fund's previous quarterly reports in determining an equitable apportionment. Dkt. 67, ¶ 177. The trustees also sought the opinions of the Masons Welfare Fund's actuaries about the financial ramifications of an allocation. Dkt. 53-7 (Bohl Dep. at 36:7–12). And even if the trustees thought, incorrectly, that the Masons Welfare Fund was not meeting its reserve target, it was still reasonable for the trustees to be concerned about the Masons Welfare Fund's finances. The employer trustees described the 10-month target as a "minimum reserve level." Dkt. 60-13, at 6. The Masons Welfare Fund had not met its reserve target since 2014, and the Masons Welfare Fund had fewer than three months' worth of reserves as recently as 2018. *Id.* at 5. And although the Masons Welfare Fund's financial outlook was improving, the trustees noted that the recent asset increase was being "warped" by decreased demand for health care services during the COVID-19 pandemic. *Id.* Accordingly, the trustees concluded that allocating assets "based on an inflated Fund balance would not be fair to the Fund and its participants." *Id.* The financial report that Ramirez cites shows that if expenses were adjusted to pre-COVID levels, the Masons Welfare Fund would have 9.8 months of reserves as of November 2020 and 10.6 months of reserves in February 2021. Dkt. 49-7, at 21. Under those circumstances, it was reasonable for the trustees to consider the fund to be in a vulnerable financial position when it decided the equitable apportionment of the fund's assets.

**2. Benefit to the withdrawing participants**

Ramirez's remaining arguments amount to mere disagreements about how the trustees weighed competing factors related to an equitable apportionment. Ramirez contends that the trustees did not consider the benefit to the withdrawing participants. He cites deposition testimony from one of the trustees, David Bohl, who stated that he did not recall any discussions at the October meeting about the effect that the allocation would have on the withdrawing participants and that "the way that we thought about it" was that "when they left, it became that other fund's responsibility to ensure that they had the resources" to pay for participants' benefits. Dkt. 53-7 (Bohl Dep. at 31:6–22.) Bohl then clarified that he was speaking only for himself. *Id.* at 32:2. ("Oh. I guess I -- I should say I.")

Bohl's testimony does not show that the trustees ignored how the allocation would affect the withdrawing participants. The notes from the October meeting show that the trustees did consider the benefit to the withdrawing participants, but concluded that the benefit to those participants from a larger allocation would be "modest or abstract, especially when weighed against the potential harm the transfer could cause to remaining participants." *See* Dkt. 60-13, at 5. Specifically, the trustees noted that the International Health Fund was more financially secure than the Masons Welfare Fund and that other groups of participants who had transferred to the International Health Fund had become eligible to receive benefits from the International Health Fund immediately. *Id.* Bohl's testimony that the withdrawing participants did not factor into *his* vote does not create a genuine dispute of fact about whether the board of trustees, as a collective body, considered how the allocation would affect the members of Local 599.

### 3. Local 599 retiree liability

After Local 599's withdrawal the Masons Welfare Fund would remain responsible for benefits to be paid to Local 599 retirees. Ramirez concedes that an equitable apportionment should "account for the additional costs" that the Masons Welfare Fund would incur to provide coverage for Local 599 retirees. Dkt. 62, at 18. But he contends that the trustees overstate the effect the retirees will have on the Masons Welfare Fund's financial health, arguing that the Masons Welfare Fund had already accounted for the costs it would incur on behalf of Local 599's retirees and that retirees from Local 599 were a small percentage of the Masons Welfare Fund's total retirement obligations. *See id.*, at 15–17. Ramirez makes a fair argument that the retiree liability did not by itself support a significant decrease in Local 599's allocation. But "[r]aising debatable points does not entitle [Ramirez] to a reversal under the arbitrary-and-capricious standard." *Sisto*, 429 F.3d, at 701. It was reasonable for the trustees to decrease the size of Local 599's allocation because of the retiree liability, and the significance of that liability is a "question[] of judgment [] left to the administrator." *See Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996).

### 4. Past treatment of withdrawing participants

One reason that the trustees provided for why transferring Local 599's Member Dollar Banks was equitable was that the Masons Welfare Fund had reached the same arrangement with another group of participants who withdrew from the plan earlier that year. In spring 2020, a group of workers known as the Heavy and Highway group—who worked primarily on highway construction projects—sought to withdraw from the Masons Welfare Fund to join the International Health Fund. The trustees approved the withdrawal and transferred Heavy and Highway's Member Dollar Bank balances to the International Health Fund.

Ramirez contends that it is not relevant that Local 599 received the same allocation as the Heavy and Highway group because Heavy and Highway's withdrawal was not governed by § 9.12 of the trust agreement. The Heavy and Highway group was not itself a union—its members were members of other unions. Ramirez argues that, by its terms, § 9.12 applies only to withdrawing unions who provide written notice of intent to withdraw. So, Ramirez's argument goes, the trustees were not required to "equitably apportion" the fund's assets to the withdrawing members of the Heavy and Highway group.

The court is not persuaded. Even if § 9.12 did not directly apply, the apportionment provided to the Heavy and Highway group was still an appropriate factor for the trustees to consider. Ramirez does not adduce evidence that the trustees ever treated other unions or employees who withdrew more favorably. And Local 599 received the same allocation as the other union that withdrew at the same time, BAC Local 5.

**C. Conclusion**

Reasonable minds could disagree about what it would mean to "equitably apportion" the Masons Welfare Fund's assets between the withdrawing participants and the remaining employees. Ramirez's arguments show, at best, that Local 599 had reasonable arguments in favor of a more generous apportionment. But Ramirez has not shown that any of the reasons cited by the trustees were phony or even seriously misguided. Under the arbitrary and capricious standard, the court must uphold the trustees' decision so long as it falls within the range of reasonable interpretations of that term. It was reasonable for the trustees to conclude that transferring only the participants' balances in the Member Dollar Banks struck an equitable balance between the needs of the withdrawing employees and the needs of the remaining participants in the Masons Welfare Fund. The trustees' decision represents a

rational application of the terms of the trust agreement to the facts of the case. Defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Plaintiff Felix Ramirez's motion for summary judgment, Dkt. 47, is DENIED.
2. Defendants' motion for summary judgment, Dkt. 56, is GRANTED.
3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered April 17, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge